John McGOVERN

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA, LOCAL # 773 and Industrial Personnel Corporation.

Civ. A. No. 77–230.

United States District Court,
E. D. Pennsylvania.

March 17, 1978.

P. C. Hensel, Maloney, Danyi, Goodman & Hensel, P. C., Bethlehem, Pa., for plaintiff.

Martin R. Lentz, Philadelphia, Pa., for Industrial Per. Corp.

Richard H. Markowitz, Philadelphia, Pa., for Union.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

Plaintiff has filed this action against his former employer, defendant Industrial Personnel Corporation (IPC), and against his former Union, defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local No. 773 (the Union), alleging that IPC breached the collective bargaining agreement by terminating plaintiff's employment on April 13, 1976, and on April 27, 1976, and that the Union breached its duty of fair representation by arbitrarily processing his grievances resulting from these discharges in a perfunctory manner.

It is undisputed that in 1962, plaintiff commenced working for Penn Dispatch Corporation, which did contract-carrying work for Sears and other companies in Allentown. In 1966, plaintiff joined the Union, and in 1968 IPC took over Sears' trucking in Allentown, at which time plaintiff went to work for IPC, with his accrued seniority retained.

Employees are required to serve in two capacities, as drivers and helpers. Generally, employees with greater seniority were employed as drivers and those with less seniority were employed as helpers, because of the higher pay and greater responsibility attendant to driving.

Plaintiff asserts that in 1975 he experienced a series of personal tragedies, including the suicide of his wife, and these events impaired his health to such an extent that he felt as a driver he might have an accident brought on by a nervous disorder. Also, in October, plaintiff was three and one-half hours late on a delivery run in New Jersey, and received a written reprimand, for which he filed a grievance, feeling that his unfamiliarity with the route justified his tardiness. Despite his belief that this reprimand would be repealed in return for his acceptance of a subsequent reprimand resulting from a minor property damage incident the tardiness reprimand was processed.

In November of 1975, Anthony Molinaro, a Union representative, requested Elder Hacker, IPC's Allentown Terminal Manager in charge of driving assignments, to switch plaintiff to the role of helper. IPC agreed to permit plaintiff to work as a helper if he submitted to a physical examination by a doctor, and IPC further agreed that plaintiff could continue in that role as long as a

physician certified that he was unable to drive, a requirement that called for periodic examinations, with no specific timetable. Plaintiff was subsequently examined by Dr. Brong, his family physician, who diagnosed his condition as "neurocirculatory asthemia", and stated that plaintiff should not drive for at least three months.

From November of 1975 to April of 1976 plaintiff worked as a helper. During that time, other senior employees, including Union Shop Steward Robert Herman, began to complain of this treatment as preferential, saying they too would like the privilege of not driving. Thus, Hacker approached plaintiff on the matter and plaintiff contended that he need not drive. He had submitted no subsequent medical reports as to his condition. Hacker subsequently reassigned plaintiff as a driver. Plaintiff refused this assignment, stating that he was physically not qualified to drive. Hacker then issued a written reprimand even though Hacker knew plaintiff was under a doctor's care, or so the plaintiff contends.

As a result of this reprimand, plaintiff, with the aid of counsel, prepared and filed a grievance on April 10, 1976, asserting that said reprimand was in disregard of Dr. Brong's diagnosis. He also stated that Molinaro had assured him that because of his seniority he did not have to drive. The Union, represented by Molinaro and Herman, then met with Hacker to discuss the matter. The Union contended that plaintiff need not drive. The issue was not resolved, and on April 13, plaintiff was again scheduled as a driver. He refused to drive, and was discharged on that day. Upon being discharged, plaintiff produced two doctors' reports, the one by Dr. Brong and one by Dr. Vogler, whom plaintiff had consulted on April 12. Plaintiff also volunteered to drive, but was told by Hacker that he, plaintiff, was discharged and that he was not to return without a Union representative. Thus, plaintiff gave a copy of the discharge notice to Molinaro and Molinaro phoned Hacker and stated that he, Molinaro, wanted this matter to go to arbitration, furnishing Hacker with a list of arbitrators.

On April 14, with the assistance of private counsel, plaintiff filed a formal grievance protesting his discharge. During the next week IPC and the Union engaged in negotiations. On April 21, Molinaro met with plaintiff and Union President Abruzzi. During this meeting, Molinaro engaged in a series of telephone calls with IPC attorney Martin Lentz, while periodically discussing settlement with the plaintiff.

The Union and IPC reached an agreement whereby plaintiff would be reinstated if he submitted to an examination by the company doctor, Dr. Feeney. It was agreed that plaintiff would not receive back pay for the layoff period; rather, this period would be counted as vacation time. It was also agreed that the agreement would be put in writing. On April 22, plaintiff was examined by Dr. Feeney, and Dr. Feeney reported that if plaintiff drove, his chances of having an accident were greater than those of other employees. Thus, on April 23 and 24, plaintiff returned to work as a helper. On April 26, plaintiff was called to the Union Hall and furnished a copy of the agreement for his examination. However, on the advice of private counsel plaintiff refused to sign the agreement. On April 27, plaintiff returned to work, but was told by Hacker he had to execute the agreement, that is, sign it. Plaintiff again refused to sign and Hacker told him he could not work and he was to leave the premises. Two days later, plaintiff filed another grievance, protesting the discharge of April 27. This grievance the Union refused to process. Molinaro felt that the decision of plaintiff not to sign triggered his discharge and was in effect an act of quitting.

Plaintiff now contends that both discharges were in violation of the collective bargaining agreement and were unlawful. He also feels the Union handled the grievances of both discharges perfunctorily because of animosities to plaintiff.

■■ We note preliminarily that plaintiff can only bring an action against IPC if he can show that the Union as bargaining agent breached its duty of fair representa-

tion in the handling of the employee's grievance. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Plaintiff alleges that the handling of the first discharge was arbitrarily and perfunctorily processed by the Union because of personal animosity on the part of Herman and Molinaro. Allegedly, Herman disliked plaintiff because of plaintiff's privilege of not driving. Thus Herman stood idly by on April 13 when plaintiff was first discharged, and did nothing. That Herman failed to act because of dislike of the plaintiff, does not establish a breach of the Union's duty, because the Union was also represented by Molinaro.

█ Plaintiff charges that Molinaro was also prejudiced against plaintiff because he felt plaintiff was properly discharged on April 13, because his refusal to drive was wrongful since he should have driven and then protested the reassignment. Plaintiff also charges Molinaro with animosity stemming from plaintiff's retention of private counsel. Initially, we are unconvinced that either of these accusations indicate hostility by Molinaro constituting bad faith. The belief by Molinaro that plaintiff deserved to be discharged does not indicate bad faith, but rather a considered judgment that plaintiff's conduct had been improper. This is not like saying plaintiff deserved to be fired because of race, creed, color or national origin, or because of his Union activism, or political beliefs or other arbitrary reasons. Instead, Molinaro was merely expressing an opinion, as a Union representative, that plaintiff had behaved improperly. Similarly, Molinaro's anger at plaintiff for heeding the advice of counsel was not the product of personal resentment, but rather exasperation on the part of Molinaro because he felt in his judgment that plaintiff, by following the advice of counsel, was jeopardizing his own chances for reinstatement. Such exasperation is the result of concern for plaintiff's welfare, not of hostility or indifference.

Moreover, assuming that Herman and Molinaro had personal animosities to plaintiff, we could not infer a breach of the duty of fair representation absent some damaging result stemming from these animosities. Here, following the April 13 discharge, Molinaro, notwithstanding his feelings that plaintiff deserved to be discharged and notwithstanding his feelings about plaintiff's retention of counsel, successfully negotiated plaintiff's reinstatement. True, plaintiff did not receive back pay for the layoff period, but the test of a union's duty is not the achievement of perfect results. The test is whether the Union's conduct was arbitrary, discriminatory or in bad faith. *Vacá v. Sipes, supra.* Thus, we conclude that by successfully negotiating plaintiff's reinstatement following the April 13 discharge, Molinaro did not act arbitrarily, discriminatorily or in bad faith and the Union did not, therefore, breach its duty to the plaintiff.

█ Likewise, there is no merit to plaintiff's accusation that the Union breached its duty with regard to the April 27 discharge. Having negotiated plaintiff's reinstatement, the Union agreed with IPC that plaintiff would sign the negotiated settlement agreement. However, the collective bargaining agreement holds that a mutual settlement of a grievance is final and binding on all parties and the employees involved. Therefore, a requirement of a signature on the agreement is binding on an employee if IPC and the Union agree upon it. Such a requirement is not inherently arbitrary, but rather a reasonable requirement in light of the parties' desire to bring the matter to a conclusion, to have such conclusion acknowledged and to prevent subsequent confusion and misunderstandings.

Thus, plaintiff's determined refusal to sign the agreement was a failure to fulfill a requirement that was binding upon him. His discharge resulted from his refusal. Having once negotiated plaintiff's reinstatement and having seen him thus spurn this reinstatement, the Union's decision not to process a grievance concerning his discharge resulting therefrom cannot be said to have been arbitrary, discriminatory or in bad faith.

**372**

Therefore, finding no breach of the Union's duty of fair representation, we shall grant the Union's motion for summary judgment. Having concluded that the Union did not breach its duty, we find no basis for an action against IPC pursuant to *Vaca v. Sipes* and we shall likewise grant the motion of IPC for summary judgment.

■ Additionally, we note that plaintiff has not alleged that he made any effort to appeal this matter to the International Union, and thus has not established exhaustion of Union remedies. *Vaca v. Sipes* held that exhaustion of Union remedies is not necessary if the employee is prevented from exhausting his remedies by the Union's wrongful refusal to process a grievance. *Goclowski et al. v. Penn Central Transportation Company,* 571 F.2d 747 (3d Cir. 1977), held that a fixed position by the Union may relieve the employee of the necessity of futile union appeals, and cited *Jones v. Trans World Airlines, Inc.,* 495 F.2d 790 (2d Cir. 1974), as holding that such exhaustion of remedies is unnecessary where it would obviously be futile. However, in *Goclowski,* the plaintiff had met with both local and international union members in pursuit of relief. In the instant case, there is no indication that plaintiff attempted to seek relief through the International Union, nor is there any indication that the alleged hostility of certain Local officials is shared by or can be imputed to officials of the International Union. An employee must at least attempt to utilize available procedures if he has not shown that to do so would be futile. *Vaca v. Sipes, supra,* 386 U.S. at 184, 87 S.Ct. 903. See also *Brady v. Trans World Airlines, Inc.,* 401 F.2d 87 (1968) at 104:

> " * * * Mr. Brady's argument that it would have been futile to ask IAM to review its own dealings with him is note tenable for IAM's internal procedure provided reasonably prompt review of his contentions on union levels *higher than those responsible for the decisions against him.*" (Emphasis ours.)

For these reasons, i. e., for failure to exhaust Union remedies and for a lack of breach of the Union's duty of fair representation, we shall grant defendants' motions for summary judgment.